E-FILED
Monday, 08 November, 2010 02:16:51 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

Vantice L. Beshears,
    Plaintiff,

vs.                                                                           09-2109

Health Professionals, Ltd.,
Dr. Stephen Cullinan and
Nurse Kendra Adam,
    Defendants.

MEMORANDUM OPINION AND ORDER

    Before the court are the Defendants' summary judgment motion [38] pursuant to Rule 56 of the Federal Rules of Civil Procedure and C.D.I.L.-L.R. 7.1, the Plaintiff's response [42] and the Defendants' reply [43].

Background

    On or about May 7, 2009, Plaintiff, Vantice L. Beshears, filed his original complaint against Health Professionals, LTD, Dr. Stephen Cullinan and Nurse Kendra Adams. On June 24, 2009, this court performed a merit review of the plaintiff's complaint. The court dismissed all claims in the complaint except the claim for deliberate indifference to a serious medical need. Plaintiff's original Complaint under 42 U.S.C. Section 1983, alleges that while Plaintiff was incarcerated at the Champaign County Correctional Center (CCCC), the defendants failed to provide him all of his medications during stays in November-December, 2007 and in February, 2008.

Standard

    Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Any discrepancies in the factual record should be evaluated in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). The party moving for summary judgment must show the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

    "Summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events.

*Johnson v. Cambridge Indus.*, Inc., 325 F.3d 892, 901 (7th Cir. 2000). A party opposing summary judgment bears the burden to respond, not simply by resting on its own pleading but by "set[ting] out specific facts showing a genuine issue for trial." *See* Fed. R. Civ. P. 56(e). In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If [the nonmovant] does not [meet his burden], summary judgment should, if appropriate, be entered against [the nonmovant]." Fed. R. Civ. P. 56(e). Further, "[t]he plaintiff cannot merely allege the existence of a factual dispute to defeat summary judgment …. Instead, he must supply evidence sufficient to allow a jury to render a verdict in his favor." *Basith v. Cook County*, 241 F.3d 919, 926 (7th Cir. 2001). Specifically, the non-moving party "must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Filipovic v. K&R Express Systems, Inc.*, 176 F.3d 390, 390 (7th Cir. 1999). Failure by the non-movant to meet all of the above requirements subjects him to summary judgment on his claims.

Affidavits must be based on the personal knowledge of the affiant and "set out *facts* that would be admissible in evidence." Fed. R. Civ. P. 56(e) (emphasis added). Personal knowledge may include inferences and opinions drawn from those facts. *Visser v. Packer Eng. Assoc., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991). "But the inferences and opinions must be grounded in observation or other first-hand personal experience. They must not be based on flights of fancy, speculations, hunches, intuitions or rumors remote from that experience." *Visser*, 924 F.2d at 659. It is also well settled that "conclusory allegations and self-serving affidavits, if not supported by the record, will not preclude summary judgment. Keri v. Barod of Trustees of Purdue University, 458 F.3d 620, 628 (7th Cir.2006)(*citing Haywood v. N. Am. Van Lines, Inc.,* 121 F.3d 1066, 1071 (7th Cir.1997)).

Undisputed Material Facts[1]

1. Dr. Stephen Cullinan is Chief Medical Officer and Co-Founder of Health Professionals, Ltd., which provides correctional health care services, and has been since 1996. (Stephen Cullinan Dec., ¶ 3, attached as Exhibit 1).
2. Dr. Stephen Cullinan also serves as the Medical Director or Staff Physician for a number of county jails in several Midwest states. (Stephen Cullinan Dec., ¶ 3)

---

[1]Plaintiff's Response [42], filed on July 15, 2010, is a series of "Counter Affidavits,"consisting of a Counter Affidavit to Defendants' Motion for Summary Judgment and a Counter Affidavit to Defendants' Memorandum of Law in Support of Motion for Summary Judgment. Plaintiff's affidavits do not properly dispute any of the facts asserted in Defendants' Motion for Summary Judgment. Rather, Plaintiff offers a general denial of the facts, law, and argument set forth in the Defendants' Motion for Summary Judgment and Memorandum of Law in Support thereof, without any competent factual support, nor any case authority contrary to that set out in Defendants' Motion. Further, the exhibits can found attached to defendants' memorandum [35].

3.  From July 1977 to November 2007, Cullinan also maintained an oncology practice as partner and founder of Oncology/Hematology Associates of Central Illinois. (Stephen Cullinan Dec. ¶ 3)
4.  Stephen Cullinan has been a clinical assistant professor at the University of Illinois - College of Medicine, Peoria, Illinois, since 1986, and from 1977 to 1986, he was an instructor in medicine there. (Stephen Cullinan Dec. ¶ 4)
5.  From 1975 to 1977, Cullinan was an instructor in oncology at the Mayo Medical Clinic at the University of Minnesota, Rochester. (Stephen Cullinan Dec. ¶ 4)
6.  Cullinan has lectured at the national conference on correctional health care on numerous occasions regarding correctional health care issues. (Stephen Cullinan Dec. ¶ 4)
7.  Cullinan is a licensed physician in the State of Illinois and board certified in oncology and internal medicine. (Stephen Cullinan Dec. ¶ 5)
8.  Cullinan's medical education includes a Doctor of Medicine degree (1972) from the University of Illinois College of Medicine, Chicago; an internship (1972 - 1973) and residency (1973 - 1975) in the Department of Internal Medicine at Henry Ford Hospital, Detroit, Michigan; and an advanced clinical trainee in the Department of Oncology at the Mayo Graduate School of Medicine, University of Minnesota, Rochester, Minnesota. (Stephen Cullinan Dec. ¶ 5)
9.  Cullinan was working in his capacity as a licensed physician performing correctional health care services for HPL at the CCCC during the following time frames: September 23, 2004 through October 19, 2004; November 20, 2007 through December 7, 2007; and February 19, 2008 through February 21, 2008. (Stephen Cullinan Dec. ¶ 6)
10. During these time frames, Vantice Beshears, Jr., was an inmate at the CCCC. (Stephen Cullinan Dec. ¶ 6)
11. Beshears was one of Cullinan's patients during the 2007 period of incarceration. (Stephen Cullinan Dec. ¶ 6)
12. Cullinan did not see or treat Vantice Beshears, Jr. at the CCCC for any reason during the February 2008 time frame. (Stephen Cullinan Dec. ¶ 6)
13. Kendra Adams ("Adams") is a Registered Nurse in the State of Illinois and has worked for Health Professionals, Ltd. (HPL) since 2004, which provides correctional health care services to the CCCC. (Kendra Adams Dec. ¶ 3, attached as Exhibit #2)
14. Prior to Adams' with HPL, she was employed by Wexford Health Sources at the CCCC for one year. (Kendra Adams Dec. ¶ 3)
15. Adams is also a trauma nurse specialist, sexual assault examiner and a registered licensed nurse in the State of Illinois and has been so licensed since 1985. (Kendra Adams Dec. ¶ 4)
16. Adams was working in her capacity as a registered nurse providing correctional health care services for HPL at the CCCC during September 23, 2004 through October 19, 2004; November 20, 2007 through December 7, 2007; and February 19, 2008 through February 21, 2008. (Kendra Adams Dec. ¶ 5)
17. During these time frames, Vantice Beshears, Jr., was an inmate at the CCCC. He was one of Adams's patients during the plaintiff's 2007 period of incarceration. Adams did not see or treat Vantice Beshears, Jr. for any reason during the 2008 time frame. (Kendra Adams Dec. ¶ 5)

18. On November 20, 2007, Vantice Beshears, Jr. again entered the custody of the CCCC on a writ from the Federal Bureau of Prisons' facility in Terre Haute, IN. He was discharged from CCCC custody on December 7, 2007. (Kendra Adams Dec. ¶ 16) (Stephen Cullinan Dec. ¶ 17)
19. Vantice Beshears Jr. arrived at the CCCC with a transfer form reflecting diagnoses made and medications made at the federal prison system and some of the medication that he was then taking through the federal prison system. The medications included the following: Albuterol inhaler (2 puffs four times daily); Amitriptyline (25mg each night); Aspirin (81mg each morning); Atenolol (50mg each morning); Carbamazepine (100mg each night); Fluoxetine (20mg- 2 tabs each morning); Hydrochlorothiazide (25mg each morning); Ranitidine (150mg –each morning and evening); Simvastin (40mg each night); and, Triamcinolone Acetonide (2 puffs four time per day). (Kendra Adams Dec. ¶ 17) (Stephen Cullinan Dec. ¶ 18)
20. Vantice Beshears Jr. was not under any prescription for Valproic Acid according to the federal prison system transfer order form. Dr. Stephen Cullinan never prescribed Valproic Acid for Vantice Beshears Jr. during the November 20, 2007 through and December 7, 2007 period of incarceration. (Kendra Adams Dec. ¶ 17) (Stephen Cullinan Dec. ¶ 18)
21. Cullinan and Adams only had limited contact with Vantice Beshears, Jr. during November and December, 2007. However, they were familiar with the medications that he was taking and the administration of the same by members of the health care unit. (Kendra Adams Dec. ¶ 18) (Stephen Cullinan Dec. ¶ 19)
22. Other than Ibuprofen or Tylenol on an as needed basis, all medication administration is recorded on Medication Administration Records (MARS). (Kendra Adams Dec. ¶ 18) (Stephen Cullinan Dec. ¶ 19)
23. Vantice Beshears, Jr. received each of the above medications per the dosage that was indicated upon his arrival throughout his entire stay with the exception of two drugs, namely: Amitriptyline and Simvastin. The foregoing is reflected by the MARS. (Kendra Adams Dec. ¶ 19) (Stephen Cullinan Dec. ¶ 20)
24. Following admission to the CCCC on November 20, 2007, Dr. Stephen Cullinan did not prescribe Amitriptyline. (Kendra Adams Dec. ¶ 20) (Stephen Cullinan Dec. ¶ 21)
25. Dr. Cullinan did not prescribe amitriptyline because in his medical judgment there were other pain medications that would be effective to treat any pain symptoms Beshears experienced. (Stephen Cullinan Dec. ¶ 21)
26. Cullinan, Adams or any other staff member did not administer Amitriptyline to Vantice Beshears, Jr. during this stay of incarceration. (Kendra Adams Dec. ¶ 20) (Stephen Cullinan Dec. ¶ 21)
27. Following admission to the CCCC on November 20, 2007, Vantice Beshears Jr. received the Simvastin medication through November 26, 2007. At that time, the medication that he brought from federal prison was exhausted. (Kendra Adams Dec. ¶ 21) (Stephen Cullinan Dec. ¶ 22)
28. Simvastin is a hypolipidemic drug belonging to the class of pharmaceuticals called "statins". It is used to control hypercholesterolemia (elevated cholesterol levels). (Kendra Adams Dec. ¶ 22) (Stephen Cullinan Dec. ¶ 22)

4

29. Dr. Cullinan did not re-prescribe the Simvastin medication once it ran out. (Kendra Adams Dec. ¶ 21) (Stephen Cullinan Dec. ¶ 23)
30. Cullinan, Adams or any other staff member did not administer Simvastin to Vantice Beshears, Jr. during the remaining duration of the stay of incarceration. (Kendra Adams Dec. ¶ 21) (Stephen Cullinan Dec. ¶ 23)
31. Neither Amitriptyline nor Simvastin were medications that the CCCC pharmacy stocked. (Kendra Adams Dec. ¶ 21) (Stephen Cullinan Dec. ¶ 24)
32. Adams followed the orders of her supervising physician with respect to the administration of medications to Vantice Beshears, Jr. (Kendra Adams Dec. ¶ 23)
33. One week (approximately half-way) into the November-December, 2007 incarceration period, some of the medication that Vantice Beshears, Jr. brought with him from the federal prison ran out. (Kendra Adams Dec. ¶ 24) (Stephen Cullinan Dec. ¶ 25)
34. The health unit then administered the medications that were ordered by Dr. Cullinan from the CCCC pharmacy. (Kendra Adams Dec. ¶ 24) (Stephen Cullinan Dec. ¶ 25)
35. Some of the medications the CCCC pharmacy stocked came in different dosage amounts than did the medications that Vantice Beshears, Jr. brought with him from federal prison. (Kendra Adams Dec. ¶ 25) (Stephen Cullinan Dec. ¶ 26)
36. Specifically, the Fluoxetine ("Prozac") that he brought from federal prison came in 10mg capsules and the same medication stocked by the CCCC came in 20mg capsules. (Kendra Adams Dec. ¶ 25) (Stephen Cullinan Dec. ¶ 26)
37. The Carbamazepine ("Tegretol") that he brought from federal prison came in 100mg tablets and the same medication stocked by the CCCC came in 200mg tablets. (Kendra Adams Dec. ¶ 25) (Stephen Cullinan Dec. ¶ 26)
38. Since the above-medications provided by the CCCC pharmacy came in dosages that were twice what Vantice Beshears Jr. required, Adams and other members of the health care unit either reduced the number of capsules to half of the number of those provided from the federal prison system or cut the CCCC tab in half to ensure that Vantice Beshears, Jr. received the appropriate dosage of those medications. (Kendra Adams Dec. ¶ 26) (Stephen Cullinan Dec. ¶ 27)
39. If Vantice Beshears, Jr. complained of any pain or headache and requested relief during this period of incarceration, I provided him with either Ibuprofen or Tylenol on an as needed basis. (Kendra Adams Dec. ¶ 27) (Stephen Cullinan Dec. ¶ 28) (Beshears Dep. Pgs. 70-71)
40. On February 19, 2008, Vantice Beshears, Jr. was again placed into the custody of the CCCC at 1:45 p.m. (Kendra Adams Dec. ¶ 28) (Stephen Cullinan Dec. ¶ 29) (Charles Glass Dec. ¶ 6 attached as Exhibit 4)
41. Beshears Jr. remained in the custody of the CCCC until February 21, 2008 when he was released at 10:30 a.m. Thus, he was only in custody (approximately) a total of 40 hours.
42. Normal protocol at the CCCC dictates that medical care visits at the CCCC would be initiated per request by the inmate/pre-trial detainee or because the inmate/pre-trial detainee indicated that he/she was being treated by a doctor, had a special medical illness or condition or in need of taking medication at the time of initial booking into the CCCC. (Kendra Adams Dec. ¶ 29) (Stephen Cullinan Dec. ¶ 30) (Charles Glass Dec. ¶ 7)

5

43. When Vantice Beshears Jr. provided his information to the initial booking officer on February 19, 2008, he denied any medical or mental health conditions, denied being treated by any doctor, denied any medication for any condition and did not make any request to see any health care professional. (Kendra Adams Dec. ¶ 30) (Stephen Cullinan Dec. ¶ 31) (Charles Glass Dec. ¶ 9)
44. When Glass conducted the examination of Vantice Beshears Jr. on February 19, 2008, he appeared to understand the information provided, the questions asked and was able to answer the questions asked in appropriate fashion. He did not exhibit any abnormal behavior. (Charles Glass Dec. ¶ 10)
45. Based on the examination by Glass, Vantice Beshears Jr. was not referred to the medical or mental health units for any treatment or follow-up. (Charles Glass Dec. ¶ 11)
46. Neither Dr. Cullinan nor Adams was aware that Vantice Beshears Jr. was in the CCCC custody from February 19, 2008 through February 21, 2008. (Kendra Adams Dec. ¶ 31) (Stephen Cullinan Dec. ¶ 32)
47. Neither Dr. Cullinan nor Adams ever had any contact with Vantice Beshears Jr. during that 2008 time frame. (Kendra Adams Dec. ¶ 31) (Stephen Cullinan Dec. ¶ 32)
48. There were no orders from Dr. Cullinan ordering the administration of any medications to Vantice Beshears Jr. during that 2008 time frame. (Kendra Adams Dec. ¶ 31) (Stephen Cullinan Dec. ¶ 32)
49. Dr. Cullinan and Adams provided Vantice Beshears Jr. with the appropriate medical care and treatment indicated throughout the duration of his incarceration at the CCCC during the periods set forth above. (Kendra Adams Dec. ¶ 32) (Stephen Cullinan Dec. ¶ 33)
50. Neither Dr. Cullinan nor Adams consciously declined to either administer specific treatment or medication in an effort to harm or otherwise cause him pain throughout the duration of his incarceration at the CCCC during the periods set forth above. (Kendra Adams Dec. ¶ 32) (Stephen Cullinan Dec. ¶ 33)
51. Adams never denied Beshears access to any physician. (Kendra Adams Dec. ¶ 32)
52. Charles Glass is a correctional officer at the CCCC and has been so employed since 1992 and was so employed on February 19, 2008. (Charles Glass Dec. ¶ 3)
53. On February 19, 2008, Glass served as the booking officer for the initial intake of an inmate named Vantice Beshears, Jr. (Charles Glass Dec. ¶ 5)
54. When Glass conducted the examination of Vantice Beshears Jr. on February 19, 2008, Glass informed him that medical care was available at the CCCC and of the emergency medical care procedures. (Charles Glass Dec. ¶ 8)
55. When Glass conducted the examination of Vantice Beshears, Jr., on February 19, 2008, he denied being treated by any doctor; denied being a diabetic; denied being on a special diet; denied being an epileptic; denied being subject to black-outs or fainting; denied drug usage; denied tooth pain; denied receiving any psychiatric treatment or taking any psychiatric medications; he denied having any such medications with him; denied any injuries; denied any blood pressure problems; and, did not make any request to see any health care professional. (Charles Glass Dec. ¶ 9)
56. When Glass conducted the examination of Vantice Beshears, Jr., on February 19, 2008, Beshears appeared to understand the information provided, the questions asked and was

able to answer the questions asked in appropriate fashion. Beshears did not exhibit any abnormal behavior at that time. (Glass Dec.)

57. Based on the examination, Vantice Beshears, Jr., was not referred to the medical or mental health units for any treatment or follow-up by Glass or anyone else. (Glass Dec.)
58. Plaintiff claims that he was not given his Tegretol and Prozac during the 11/20/07 through 12/7/07 stay. (See Plaintiff's Complaint in 09-2109) (See also, Beshears Dep. Vol. II, Pg. 11, 12-19; and Pg. 13, 5-14 attached as Exhibit 5)
59. Plaintiff claims that the defendants were cutting his medication in half to attempt to ration it and that Plaintiff's only proof of that assertion is that when the medications were administered, they were administered in half tablet form or with a decreased number of tablets. (Beshears Dep. Vol. II, Pg. 11, 12-19; and Pg. 13, 5-14)
60. Plaintiff admits that this theory about the half ration is speculation at best. (Beshears Dep. Vol. II, Pg. 14, 19-21)
61. Plaintiff never submitted any written grievances or complaints to any health care unit regarding an increase in symptoms because of the alleged change in medications. (Beshears Dep. Vol. II, Pg. 18)
62. Plaintiff never saw Dr. Cullinan during the November-December, 2007 incarceration. (Beshears Dep. Vol. II, Pg. 19, 10-18)
63. Plaintiff complains that he also was denied the proper administration of Valproic acid. (See Plaintiff's Complaint in 09-2109)
64. Plaintiff admits, however, that he believes that he received the Valproic Acid medication during the November-December, 2007 period. (Beshears Dep. Vol. II, Pg. 14-15, 22- 23 and 1-17, respectively; Pg. 23, 20-23)
65. Plaintiff admits that he had no contact with Cullinan or Adams during his February 2008 period of incarceration with the CCCC. (Beshears Dep. Vol. II, Pg. 25, 22-23; Pg. 26, 1-2)
66. Plaintiff's claim is for the alleged failure to administer the proper amount of the Prozac, Tegretol, Simvastin and Amitriptyline medications for the 11-12/07 and 2/19-2/21, 2008 periods of incarceration at the CCCC in both 06-2132[2] and 09-2109. (Beshears Dep. Vol. II, Pgs. 26, 1-23; and 27, 1)

Discussion and Conclusion

In this case, the Plaintiff complains that he did not receive his appropriate medications during two periods of incarceration at the CCCC. The first period was in between November 20,

---

[2] The court takes judicial notice that Beshears did raise these claims in 06-2132, but that case is assigned to the Honorable Harold A. Baker. Further, the court notes that the defendants brought this fact to Judge Baker's attention in 06-2132. Further, the court notes that in the defendants' instant summary judgment motion, they addressed plaintiff's 2004 claims raised in 06-2132. As the plaintiff did not raise those claims in this case, the court has not considered the claims or the facts pertaining to the 2004 claims and will not address the 2004 claims in this lawsuit. Those claims will be addressed by Judge Baker in the 06-2132 case.

7

2007 and December 7, 2007; and, February 19, 2008 and February 21, 2008. During the 2007 incarceration, Plaintiff had returned to the CCCC from federal prison in Terre Haute pursuant to a writ. Plaintiff came from the federal prison with some medications for approximately one week, the anticipated length of his stay. Ultimately he stayed a total of eighteen days. In this period of incarceration, Plaintiff complains that he did not receive two medications the entire time, namely: Amitriptyline and Simvastin. Amitriptyline was prescribed for non-specific pain and Simvastin was prescribed for high cholesterol. Dr. Cullinan made the medical judgment that Plaintiff's pain symptoms could be treated effectively for the short period of time in the CCCC with either ibuprofen or Tylenol. To the extent that Plaintiff ever articulated a pain complaint, he was provided ibuprofen or Tylenol. These pain medications substituted for the amitriptyline. Again, as stated above, this constitutes a medical judgment and reflects that Dr. Cullinan addressed the Plaintiff's pain symptoms. Dr. Cullinan also approved the administration of the Plaintiff's Simvastin medication from the federal prison. Plaintiff received his Simvastin from November 20, 2007 through November 26, 2007. At that time, the medication from the prison ran out. Dr. Cullinan did not enter an order for that medication to be continued for the remaining ten days of the incarceration. Thus, Plaintiff did not receive it.

In this case, the facts show that the Plaintiff was prescribed medication intended to address the Plaintiff's pain and medical needs. There is no dispute that for 100% of his stay Plaintiff received pain medications to the extent that he requested them. There is no dispute that Plaintiff received his Simvastin medication for more than a third of his stay. As to the fact that he did not receive his one-time per day Simvastin dose for ten days, plaintiff has shown no harm and therefore this constitutes a de minimus omission and not a constitutional violation. The alleged failure to administer complete and appropriate dosages of the Tegretol, Valproic acid and Prozac medications are inaccurate, speculative and based on unreliable data. In Plaintiff's Amended Complaint, filed in 06-2132 a case pending before the Honorable Harold Al Baker, the Plaintiff asserts that he did not receive his complete ration of valproic acid while in the CCCC in November-December, 2007 and in February, 2008. However, in his deposition, he recants that assertion and admits that the health care providers at the CCCC did provide him the complete dosage and pill of valproic acid. He admits that they could not cut it in half and therefore had to administer it whole and did so. Thus, the administration of valproic acid cannot serve as the basis for liability for Cullinan or Adams. Plaintiff also claims that he only received half rations of his Tegretol and Prozac for ten days starting November 27, 2007 through his discharge from the CCCC on December, 2007. The only basis for this assertion is that the medication was administered either in less capsules or physically cut in half. Simply put, Plaintiff is mistaken. One week (approximately half-way) into the November-December, 2007 incarceration period, some of the medication that Vantice Beshears, Jr. brought with him from the federal prison ran out. The health unit then administered the medications that were ordered by Dr. Cullinan from the CCCC pharmacy. Some of the medications the CCCC pharmacy stocked came in different dosage amounts than did the medications that Vantice Beshears, Jr. brought with him from federal prison. Specifically, the Fluoxetine ("Prozac") that he brought from federal prison came in 10 mg capsules and the same medication stocked by the CCCC came in 20 mg capsules. The Carbamazepine ("Tegretol") that he brought from federal prison came in 100mg tablets and the same medication stocked by the CCCC came in 200mg tablets. Since the

8

above medications provided by the CCCC pharmacy came in dosages that were twice what Vantice Beshears Jr. required, Adams and other members of the health care unit either reduced the number of capsules to half of the number of those provided from the federal prison system or cut the CCCC tab in half to ensure that Vantice Beshears, Jr. received the appropriate dosage of those medications. Therefore, Cullinan cannot be liable for a constitutional violation.

Kendra Adams is entitled to summary judgment because she was not deliberately indifferent to the Plaintiff's serious medical needs. The alleged failure to administer complete and appropriate dosages of the Tegretol, valproic acid and Prozac medications are inaccurate, speculative and based on unreliable data. In Plaintiff's Amended Complaint he asserts that he did not receive his complete ration of valproic acid while in the CCCC in November-December, 2007 and in February, 2008. However, in his deposition, he recants that assertion and admits that the health care providers at the CCCC did provide him the complete dosage and pill of valproic acid. He admits that they could not cut it in half and therefore had to administer it whole and did so. Thus, the administration of valproic acid cannot serve as the basis for liability for Cullinan or Adams. Plaintiff also claims that he only received half rations of his Tegretol and Prozac for ten days starting November 27, 2007 through his discharge from the CCCC on December, 2007. The only basis for this assertion is that the medication was administered either in less capsules or
physically cut in half. Simply put, Plaintiff is mistaken. One week (approximately half-way) into the November-December, 2007 incarceration period, some of the medication that Vantice Beshears, Jr. brought with him from the federal prison ran out. The health unit then administered the medications that were ordered by Dr. Cullinan from the CCCC pharmacy. Some of the medications the CCCC pharmacy stocked came in different dosage amounts than did the medications that Vantice Beshears, Jr. brought with him from federal prison. Specifically, the Fluoxetine ("Prozac") that he brought from federal prison came in 10mg capsules and the same medication stocked by the CCCC came in 20mg capsules. The Carbamazepine ("Tegretol") that he brought from federal prison came in 100mg tablets and the same medication stocked by the CCCC came in 200mg tablets. Since the abovemedications provided by the CCCC pharmacy came in dosages that were twice what Vantice Beshears Jr. required, Adams and other members of the health care unit either reduced the number of capsules to half of the number of those provided from the federal prison system or cut the CCCC tab in half to ensure that Vantice Beshears, Jr. received the appropriate dosage of those medications. Therefore, Adams cannot be liable for a constitutional violation.

Third, during the less than forty-eight hour stay at the CCCC in between February 19, 2008 and February 21, 2008, the Plaintiff failed to notify the booking Officer that he was on any medications or in need to see any physician. Officer Glass of the CCCC checked in the Plaintiff on February 19, 2008. When Glass conducted the examination of Vantice Beshears Jr. on February 19, 2008, Glass informed him that medical care was available at the CCCC and of the emergency medical care procedures. When Glass conducted the examination of Vantice Beshears, Jr., on February 19, 2008, he denied being treated by any doctor; denied being a diabetic; denied being on a special diet; denied being an epileptic; denied being subject to black-outs or fainting; denied drug usage; denied tooth pain; denied receiving any psychiatric

treatment or taking any psychiatric medications; he denied having any such medications with him; denied any injuries; denied any blood pressure problems; and, did not make any request to see any health care professional. When Glass conducted the examination of Vantice Beshears, Jr., on February 19, 2008, Beshears appeared to understand the information provided, the questions asked and was able to answer the questions asked in appropriate fashion. Beshears did not exhibit any abnormal behavior at that time. Based on the examination, Vantice Beshears, Jr., was not referred to the medical or mental health units for any treatment or follow-up by Glass or anyone else. Dr. Cullinan and Kendra were never made aware that Plaintiff was even in the facility much less that he was in need of any medical care, including any need for medications. Dr. Cullinan and Nurse Kendra never saw the Plaintiff during this time frame. As such, they cannot have been deliberately indifferent to the Plaintiff's medical needs during that time frame. Similarly, Dr. Cullinan and Kendra were not aware that Plaintiff was at the County Correctional Center in February 2008. Dr. Cullinan and Kendra never saw the Plaintiff while Plaintiff was incarcerated at the CCCC in February 2008. As such, they cannot have been deliberately indifferent to the Plaintiff's medical needs during that time frame.

Beshears has failed to show that he was injured or significantly harmed by any action or inaction on the part of Dr. Cullinan or Kendra Adams and, therefore, Defendants are entitled to summary judgment. Defendants are entitled to summary judgment because Plaintiff has failed to show that he suffered any harm or injury from the alleged denial of medication and treatment. "[T]he denial of medical treatment satisfies the deliberate indifferent standard only if significant harm or injury is shown." *Board v. Farnham*, 394 F.3d 469, 479 (7th Cir. 2005) (emphasis in original)(citation omitted). In this case, Plaintiff has not shown that he was injured or harmed from Defendants' alleged failure to provide the medications and treatments for the dizziness spell condition from 11/20/07-12/7/07 and 2/19/08-2/21/08. Similarly, there is no evidence that any condition arose or worsened between 11/20/07-12/7/07 and 2/19/08-2/21/08. In sum, Beshears has failed to show that he was injured or significantly harmed by any action or inaction on the part of Dr. Cullinan or Kendra Adams and, therefore, Defendants are entitled to summary judgment.

Further, Defendant Health Professionals, Ltd., is entitled to summary judgment because it cannot be held liable under a theory of respondeat superior. It is well established that an entity cannot be held liable under Section 1983 under a respondeat superior theory. *Monell v. New York City Dept. of Social Services*, 463 U.S. 658, 691 (1978); *Thompson v. Boggs*, 33 F.3d 847, 859 n.11 (7th Cir. 1994). Otherwise said, an entity cannot be held vicariously liable for its employees' constitutional torts. A municipality can only be held liable under Section 1983 if a policy or custom attributable to municipal policy makers is found to be the moving force behind the alleged constitutional deprivations. *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002) (citation omitted). In this case, Beshears has made no allegations that Health Professionals, Ltd., as an entity, has done anything to deprive him of his constitutional rights. Rather, he has alleged that Dr. Cullinan, and Kendra Adams, independent contractors for Health Professionals, Ltd., were deliberately indifferent to his serious medical needs. *See* complaint. Thus, at most, Plaintiff has alleged Health Professionals, Ltd., is vicariously liable for any

constitutional torts committed by Dr. Cullinan or Kendra Adams, one of its independent contractors; however, Section 1983 does not permit such liability. Moreover, Health Professionals, Ltd., is not a municipal entity and therefore cannot be held liable under a Monell theory. Even if a Monell claim was possible, Plaintiff has failed to allege or otherwise show that Health Professionals, Ltd., has a policy or custom that was the direct cause or moving force behind Harris' alleged failure to receive the medications. For these reasons, Health Professionals, Ltd., is entitled to summary judgment.

It is therefore ordered:

1. The defendants' motion for summary judgment [38] is granted. The clerk of the court is directed to enter judgment in favor of the defendants and against the plaintiff pursuant to Fed. R. Civ. P. 56. The case is terminated, in its entirety
2. If the plaintiff wishes to appeal this dismissal, he must file a notice of appeal with this court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal. *See* Fed. R. App. P. 24(a)(1)(C). If the plaintiff does choose to appeal, he will be liable for the $455.00 appellate filing fee irrespective of the outcome of the appeal. Furthermore, if the appeal is found to be non-meritorious, the plaintiff may also accumulate a strike under 28 U.S.C. 1915(g).
3. Although his lawsuit is terminated, the plaintiff is still obligated to pay the filing fee in full. *See* 28 U.S.C.A. § 1915(b)(1). The clerk is directed to mail a copy of this order to the plaintiff's place of confinement, to the attention of the trust fund office. Release from incarceration does not relieve the plaintiff's obligation to pay the filing fee in full. The plaintiff must notify the clerk of the court of a change of address and phone number within seven days of such change.

Enter this 8th day of November 2010.


/s/ Michael P. McCuskey
_____
Michael P. McCuskey
Chief United States District Judge